OPINION OF THE COURT
Arthur D. Spatt, J.
BACKGROUND
As of January 1, 1977, under the terms of the most recent *329 collective bargaining agreement (herein referred to as "agreement”) between the County of Nassau (herein referred to as "County”) and the Nassau Chapter of the Civil Service Employees Association (herein referred to as CSEA), the County has determined salary increments due its employees based upon two distinct salary plans. One plan, denominated the "Incremental Graded Salary Plan” or "Plan A”, provides for a "step system”; the other, denominated "Non-Incremental Graded Salary Plan” or "Plan B”, does not. As to the application of the plans, the agreement provides as follows:
"14.1 Both parties hereto agree that the graded salary plans previously and currently in existence and affecting various employees as established by Ordinance No. 95-A of 1957, shall be amended so as to provide a continuance of said plans for those employees included therein whose service commenced no later than December 31, 1976. All new employees entering County service on or after January 1, 1977, shall not receive benefits of said Graded Salary Plan, but shall be included in the newly created 'Non-Incremental Graded Salary Plan’, as provided for in said ordinance.
"14.2 An officer or employee who tranfers from any county department or agency or position to any other department or agency or position covered by this agreement shall be deemed to have an initial employment date as of the date of his original appointment as a County officer or employee”.
CSEA commenced this action on behalf of those of its members who, prior to December 31, 1976, were hired to perform services for the County pursuant to the terms of the Comprehensive Employment and Training Act of 1973 (herein referred to as CETA) and who, subsequent to January 1, 1977, were placed in county positions funded by general tax dollars and not CETA. CSEA contends that their members, while in CETA funded positions, were, pursuant to the terms of the agreement, "employees” who are entitled to be continued under the "Incremental Graded Salary Plan”.
The County disagrees. It contends that these persons became county employees post 1976; that is, only upon obtaining jobs funded by the County. The County argues these persons are "new employees”, whose salary increments are governed by the nonincremental plan. A declaratory judgment is sought to resolve the dispute.
This matter has been submitted to the court upon a stipulated set of facts.
*330 THE FACTS
CSEA is the certified exclusive bargaining representative of a unit of "employees”, as the term is defined under the agreement. The agreement (§ 1.3) defines "employee” as an individual who is in the "negotiating unit”. "Negotiating unit” is defined as "all employees” included in the certification of representative and order to negotiate covered by the Public Employment Review Board (herein referred to as PERB) on October 18, 1968, as amended by PERB. The PERB certificate defines the unit as "All Nassau County employees”, excluding 47 specific job titles. None of these excluded positions is at issue here. Neither the PERB certification nor any portion of the agreement removes persons occupying positions pursuant to CETA funding from the classification "employee”.
Pursuant to the terms of section 14.1 of the agreement, as quoted above, the board of supervisors enacted the following amended ordinance on January 4, 1977:
"Section 1. Ordinance No. 175-1967 as entitled above and as amended, is hereby further amended and shall continue to remain in full force and effect for all employees who commenced service with Nassau County on or before December 31, 1976 and is hereby further amended by annexing thereto a new Schedule 'A’ in lieu of prior schedules which said new Schedule 'A’ shall contain the salary schedule for all employees of Nassau County commencing on or before December 31, 1976. Said Schedule 'A’ is annexed hereto and made a part hereof. Said schedule shall be subdivided into Schedule 'Al’ and 'A2\ 'Al’ shall set forth the salaries of employees covered by the salary plan as provided for by Ordinance No. 95-A-1957, as amended, and Schedule 'A2’ shall provide salaries for those employees first covered under the graded salary service plan as provided for in Ordinance No. 175-1967, as amended.
"Section 2. All persons commencing employment with Nassau County on or after January 1, 1977 shall receive a starting salary as reflected in Schedule 'B’ attached hereto and made a part hereof. All of said new employees commencing County employment on or after January 1, 1977 shall not become members or enjoy any of the benefits of the graded salary plan with steps contained therein and set forth in Schedule 'A’ but shall be limited to receive such renumeration as is contained on Schedule 'B’ plus any additional sums which may be negotiated between the bargaining unit and the County on a year-to-year basis.
*331 "Section 3. All persons who transfer from one department or agency to any other department or agency of Nassau County shall be deemed to have an initial employment date as of the date of his original employment as a County officer or employee. An officer or employee who has a break in service, not to exceed one year shall be deemed to have an initial employment date as of the date of his original appointment as a County Officer or employee, and shall receive the benefits enjoyed in Schedule 'A’ attached hereto and made a part hereof, if so appropriate.”
Prior to January 1, 1977, and continuing thereafter, the County, as part of a consortium of local governmental bodies, used the services of individuals hired pursuant to the provisions of CETA (US Code, tit 29, § 801 et seq.) and the rules and regulations promulgated thereunder by the United States Department of Labor.
The legislative purpose behind CETA is set forth at section 801 of title 29 of the United States Code which provides, in part, as follows: "It is the purpose of this chapter to provide job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons which will result in an increase in their earned income, and to assure that training and other services lead to maximum employment opportunities and enhance self-sufficiency by establishing a flexible, coordinated, and decentralized system of Federal, State and local programs”.
Although the CETA legislation (US Code, tit 29, § 824, subd [c], par [1]) indicates that its application shall not result in the displacement or loss of seniority by any non-CETA member, it nonetheless provides in less than a precise fashion for CETA workers to be accorded, with certain exceptions, the same benefits and conditions as non-CETA workers. Specifically, title 29 (§ 824, subd [k]) of the United States Code provides, in pertinent part, as follows: "All persons employed in public service jobs shall be provided workers’ compensation, health insurance, unemployment benefits, and other benefits and working conditions at the same level and to the same extent as other employees working a similar length of time, doing the same type of work and similarly classified. Any such classification must be reasonable and must include nonfederally financed employees”.
That this provision was intended to create a limited parity between CETA and non-CETA workers is evidenced by the *332 further requirement set forth in its rules and regulations of the Department of Labor (Fed Reg, vol 41, No. 124, § 98.24) which provides, in part, as follows: "(b) Each participant in an on-the-job training, work experience, or public service employment program shall also be assured of health insurance, unemployment insurance, coverage under collective bargaining agreements and other benefits at the same levels and to the same extent as other employees similarly employed”. (Emphasis supplied.)
However, the CETA indicates that a distinction may be made between CETA workers and others for purposes of determining eligibility for membership in a retirement system or in plans which provide benefits based on age or service or both.
It is stipulated that the workers involved herein were hired at step one of an appropriate labor grade of the Nassau County Graded Service Salary Plan in existence prior to January 1, 1977. These persons, while in positions funded by CETA, received all benefits of the agreements between the County and CSEA except that they were not included in the New York State Employees Retirement System. They were paid by Nassau County check; supervised by county employees; given county identification cards; received sick leave, holidays, personal and bereavement leave and all other benefits accorded other county workers under the collective bargaining agreement then in effect. These workers received annual salary increments on January 1 of each year following the date of their employment. Further, when each of these persons, subsequent to January 1, 1977, took taxpayer locally funded positions with the County, the County permitted them to carry with them any vacation and/or sick leave accrued during their previous service.
Further, each of these persons, while in CETA funded positions, was permitted by CSEA to join the union; and the County, on behalf of CSEA, deducted biweekly dues from their checks. After January 1, 1977, when the "agency shop” deduction was legalized by the Civil Service Law, the County deducted such agency shop fees from the salaries of such persons and forwarded said moneys to CSEA pursuant to the agreement.
CONCLUSION
Upon a review of the facts, the collective bargaining agree *333 ment and the few cases addressing the issue presented, the court concludes that for purposes of placing the pre-1977 CETA workers in an appropriate salary plan as per the 1977 agreement, such workers must be considered "employees” at the time they first commenced service, albeit under CETA funding. Such workers are thus entitled to be continued in the "Incremental Graded Salary Plan”, Plan "A”. Here is why.
1. By the terms of the Federal legislation outlined above, CETA workers receive those benefits which arise out of applicable collective bargaining agreements. A review of the collective bargaining agreement at issue herein indicates that such workers come within its definition of "employees”. As the agreement specifically excepts certain workers from its coverage, and as CETA workers formed a rather large segment of the total work force, it cannot be presumed that any failure to specifically withhold benefits from CETA workers was an oversight. This is significant when it is recalled that the CElA, as indicated above, provides that a distinction may be made when it comes to denying benefits to such workers based upon "service”. While it is not clear to this court whether "carry over” rights, as involved herein, is the type of "service” benefit contemplated by the statute, the absence of any distinction in the agreement forecloses any such argument by the County.
2. Although the court has been able to find no case directly in point, recent case law indicates that CETA workers employed in public service positions have been held subject to all State laws, rules, regulations and penalties for violating same, as are locally salaried public employees. (See Matter of Mennella v Mills, 89 Misc 2d 1002.)
It would appear therefore that but for the technical question of funding, these workers are to be accorded status as municipal employees. (Cf. Matter of Somers Cent. School Dist, 12 PERB 3068.) If the CETA worker is to bear the responsibility of the public employee, he should, in equity, receive the benefits for which he has worked and which his representative —to whom he must pay dues — has negotiated.
3. In determining whether workers funded by CETA were considered employees by the County, the conduct of the County itself toward these workers points in one direction. The CETA worker received all benefits accorded county employees; was paid by county check; and was permitted to accrue and "carry over” county benefits. This is probative *334 evidence as to the county’s interpretation of the contract, and how they defined, up to the point of this litigation, the status of the CETA worker.
4. Finally, the court notes that behind the CETA is a basic societal intent to bring persons into the job market who would not normally be employed in these positions and afford them upward mobility. Certainly the County had such goals in mind when it implemented the CETA program. The benefits, however, have not been one sided. When the County placed the former CETA worker on its own payroll, it employed a person who had skills and training in the very position he was to fill. Certainly, to obtain such skilled workers, the County should be required to pay such person no less than it would any other person who has had such prior experience. For the County to discount such experience would not only be unfair to the individuals, but it would be contrary to the philosophy underlying CETA.